UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ANGELINA F. PICCINI,

Plaintiff,

-against-

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

-------------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____           │
│ DATE FILED:__  6/27/2014         │
└─────────────────────────────────┘
```

13-CV-03461 (AJN)(SN)

REPORT AND
RECOMMENDATION

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE ALISON J. NATHAN:

Plaintiff Angelina Piccini, appearing *pro se*, brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the final determination of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB"). The Commissioner moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Piccini did not oppose the motion. Because I conclude that the administrative law judge ("ALJ") failed to follow 20 C.F.R. § 404.1535(a) in considering Piccini's substance abuse in his disability determination, I recommend that the Commissioner's motion be DENIED and the case be remanded for further consideration.

## PROCEDURAL BACKGROUND

On September 16, 2010, Piccini submitted an application for DIB. On February 25, 2011, the Social Security Administration (the "SSA") denied this application, and on March 24, 2011, Piccini appealed, requesting a hearing before an administrative law judge. Piccini appeared with

counsel before ALJ Michael Rodriguez on March 19, 2012. The ALJ issued a decision on April 6, 2012, denying Piccini benefits. The Appeals Council denied Piccini's request for review of the ALJ's decision on April 4, 2013, thereby rendering the decision of the Commissioner final.

On May 22, 2013, Piccini filed this *pro se* action. On June 6, 2013, the Honorable Alison J. Nathan referred Piccini's case to my docket for a report and recommendation. On January 13, 2014, the Commissioner filed a motion for judgment on the pleadings with supporting memorandum of law. On February 24, 2014, the Court issued an Order directing Piccini to file a response by March 10, 2014, otherwise the motion would be considered fully briefed. Piccini did not file a response to the Commissioner's motion for judgment on the pleadings, and the motion is considered fully briefed.

## FACTUAL BACKGROUND

The following facts are taken from the administrative record.

## I.      Non-Medical Evidence

Piccini was born on November 18, 1982, and at the time of the hearing, lived in an apartment in New York with her two young sons. She completed the ninth grade and had attempted, but failed to pass, the General Educational Development ("GED") test.

Piccini's sister, who had lived with her until only a few months before the hearing, completed a function report for Piccini, dated January 10, 2011. According to this report, Piccini prepared her older son for school each day, attended appointments, and cared for her younger son at home during the day. She prepared meals for her children and bathed them. She was able to help her older son with his homework. Her sister indicated that Piccini had no problem with personal care.

Piccini shopped in stores once or twice a month for clothing, groceries, or household supplies, and she could pay her bills, count change, and use a checkbook. Piccini's sister reported that Piccini watched television and interacted with her children, but did not go outside very often. She socialized on Facebook or on the phone once or twice a week. Her sister described Piccini as a loner. The family had tried to speak with her about the effect of alcohol on her life, but alcohol had consumed her.

Her sister indicated that Piccini's impairments made it difficult for her to concentrate on her daily activities, and thus, she often completed chores improperly. Piccini could not work, think properly, or live a normal life, all of which she could do before her illness. Her sister also had concerns about Piccini's ability to manage her money. Piccini's condition affected her ability to understand, concentrate, follow instructions, complete tasks, and get along with others. Piccini did not know how to handle stress, took longer to adjust to changes, and was very emotional. Her sister indicated that Piccini's comprehension was not age-appropriate, and she could follow only about 30 percent of written instructions and 40 percent of oral instructions. Piccini did not get along well with authority figures.

Piccini's sister stated that she did not believe that Piccini could handle a job at that time. She had mental health issues since she was a teenager and had not been able to live a normal life. She had been dealing with bipolar disorder, depression, suicidal thoughts, and alcoholism for many years. Her sister believed that a program to help her with her expenses would allow her to focus on getting better.

3

II.       **Relevant Medical History**

   **A.  Medical Evidence Before June 29, 2010**

Piccini was taken to Lincoln Hospital by her sister on March 8, 2009, after claiming to

have consumed 17 Seroquel and three beers. Piccini described being angry at her boyfriend

because he was seeing someone else and had not been helping with their baby. Piccini was

subsequently transferred to New York Presbyterian Hospital ("NYPH").

On March 10, 2009, a social worker at NYPH completed a psychiatric intake evaluation.

Piccini told the social worker that she had exaggerated the number of pills she took because she

wanted the attention, but she loved her life and her kids and did not want to die. Piccini admitted

having problems controlling her anger and coping with her feelings. She denied psychotic or

manic symptoms or any homicidal ideation. The social worker indicated, however, that it was

unclear if Piccini was minimizing her symptoms. Piccini described having behavioral problems

as a teen and using cocaine at 14. She was prescribed Seroquel in October 2008 by a psychiatrist

at her drug treatment program, but Piccini did not take the medication because it made her feel

"too dopey" to take care of her children. (R. 202.) She also failed to take an antidepressant that

had been prescribed for her.

Piccini's general appearance and hygiene were adequate. She was cooperative and her

attention was good. Her speech was normal and her mood was euthymic. Her thought process

was goal-directed and she displayed no delusions or hallucinations. Her insight, judgment, and

impulse control were poor. Her cognitive functioning and memory were intact, and her

intellectual functioning was average. She was diagnosed with depressive disorder and her Global

Assessment of Functioning ("GAF")[1] was 11-20, indicating that there was some danger of hurting herself or others. Piccini indicated that she might consider taking an antidepressant but generally did not want to be medicated. The report noted that "admission to a psychiatric facility was medically necessary to provide acute psychiatric treatment that could reasonably be expected to improve her symptoms/condition." (R. 205.) This report was also signed by Dr. Zambenedetti.

On March 19, 2009, a psychiatric psychosocial assessment was performed by a social worker at NYPH. Piccini reported that she lived with her children and had a "close and supportive family" that were involved with her treatment. (R. 190-91.) Piccini described herself as a "troubled kid," who did not obey school rules and often fought with her peers. (Id.) Piccini informed the social worker that she had an active social life with family and friends but stopped communication with her friends because they all used drugs. The father of Piccini's younger child was physically and emotionally abusive. Piccini indicated that she planned to move to Virginia in two weeks. The social worker noted that she might be without treatment or benefits for a period of time during the transition.

On the same date, Dr. Asemota completed a psychiatric discharge summary. Piccini's clinical disorders were depressive disorder, alcohol abuse, and cocaine dependence.  Piccini's GAF was 51-60, indicating moderate symptoms. Dr. Asemota indicated that Piccini had no prior psychiatric hospitalization. While Piccini admitted to one previous suicide attempt at the age of

---

[1] "[Global Assessment of Functioning] rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning." Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 34 (4th ed. rev. 2000)). The Court notes that the Fifth Edition of the DSM has discarded the use of GAF Scores. See Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013). The DSM IV, however, was in effect at the time of Piccini's treatment.

15, she denied any subsequent suicidal ideation. Piccini reported chronic anxiety and mild depression. She denied having low energy, but stated that she became emotional easily. She denied having a history of manic symptoms or psychosis. She had not used any illegal substances for a year and had attended outpatient substance abuse treatment in the past. Piccini informed that doctor that she did not have a current psychiatrist. She had received the Seroquel from her previous addiction psychiatrist but only took one dose because it made her feel tired.

Piccini originally minimized her alcohol intake but then admitted that she would drink five drinks at a time, usually twice a week, but had escalated her drinking recently. She admitted that she used alcohol to replace cocaine but declined an intensive rehab referral. Piccini believed she could quit drinking on her own with the help of the groups she attended.

Piccini's mood was good and her affect was euthymic throughout her stay at NYPH. She had no further suicidal ideation and was prescribed Celexa for her depression. Piccini's appearance and hygiene were adequate. She was cooperative and her attention was good. Her speech was normal and her affect was full. Her thought process was goal directed, and there was no evidence of delusions or hallucinations. Her insight, judgment, and impulse control were fair. Piccini's condition upon discharge was much improved and her prognosis was good.

**B. Medical Evidence After June 29, 2010**

**1. Northern Virginia Mental Health Institute**

After moving to Virginia to live with her parents, Piccini was sexually assaulted by her uncle. This led to Piccini drinking and overdosing on Advil, resulting in her hospitalization from September 3-8, 2010. She was diagnosed with recurrent major depression and alcohol abuse. Her GAF was 45, indicating serious symptoms. The reason for her hospitalization was mood

disturbance. She was discharged as improved, though not recovered. She was prescribed medication for her depression and to help her sleep.

### 2. Newburgh Mental Health Clinic

Upon returning to New York State, Piccini began treatment at the Newburgh Mental Health Clinic. On March 3, 2011, Dr. Prasad Angara performed a psychiatric evaluation for Piccini and diagnosed her with major depressive disorder (recurrent and moderate), bipolar II disorder, panic disorder with agoraphobia, alcohol dependence, and borderline personality disorder. Piccini's GAF was 55, indicating moderate symptoms. Dr. Angara described Piccini as young and articulate with a fair prognosis with treatment. Piccini needed individual psychotherapy for low self-esteem. Dr. Angara would consider medication, particularly Zoloft, after reviewing her lab work and medical records. Dr. Angara also recommended treatment for alcohol and substance abuse as well as a referral for VESID for vocational training.

During the examination, Piccini was alert and cooperative, though slightly anxious. Her speech was spontaneous, coherent, relevant, and goal-directed. Piccini reported vague feelings of paranoia but denied hearing any voices. She also reported mild mood changes but there was no evidence of manic episodes. Piccini reported depression, panic, and anxiety. Piccini denied any thought of harming herself or others. She was oriented but reported problems with her memory and concentration. Piccini could recall only one out of three items after five minutes, could not perform serial sevens, and could not interpret proverbs. Her intellect was average, insight limited, and judgment fair.

On April 6, 2011, Dr. Angara completed a psychiatric assessment for Piccini. Dr. Angara noted that Piccini had been admitted to the clinic at Rockland Psychiatric Center – Newburgh approximately one month prior. She was scheduled for weekly therapy sessions and was being

7

offered group therapy. She would also be seen monthly by the psychiatrist for medication and symptom management. Dr. Angara described Piccini as exhibiting mood lability. Piccini reported panic attacks, during which she believed she was dying. She had emotional regulation problems, including depression, panic, and angry outbursts. Piccini reported racing thoughts and restlessness. Dr. Angara noted that Piccini's impairments lasted or could be expected to last at least twelve months.

On April 7, 2011, Dr. Angara completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) form and concluded that Piccini's symptoms interfered with her ability to work. Dr. Angara noted that Piccini had paranoid ideation, mood lability, emotional regulation problems, panic attacks, racing thoughts, and difficulty in getting along with others, particularly her peers. Dr. Angara described Piccini as highly anxious, pacing, and restless. Dr. Angara also noted that Piccini had particular difficulty in public places. Dr. Angara concluded that Piccini's ability to relate to co-workers, deal with the public, deal with work stresses, and maintain attention and concentration was poor or none. [2] Dr. Angara also indicated that Piccini's ability to understand, remember, and carry out complex job instructions was only fair, as was her ability to follow work rules, use judgment, and interact with supervisors. While Piccini's ability to maintain her personal appearance was unlimited or very good, her ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability was

---

[2] The assessment form provides the following descriptions for each of the possible categories from which the physician may choose: "Unlimited or Very Good – Ability to function in this area is more than satisfactory. Good – Ability to function is this area is limited but satisfactory. Fair – Ability to function in this area is seriously limited, but not precluded. Poor or None – No useful ability to function in this area." (R. 268.)

only fair. Dr. Angara indicated that Piccini had unlimited or very good ability to function independently and could manage benefits in her own best interest.[3]

### C. The Commissioner's Medical Exams

#### 1. Alan Dubro, Ph.D., Consultative Physician

On February 22, 2011, Dr. Alan Dubro, Ph.D. evaluated Piccini at the Commissioner's request. Piccini took a taxi to the exam. Piccini reported that she was psychiatrically hospitalized in March 2009, September 2009, and September 2010 for the treatment of a mood disorder and substance abuse problems. Piccini reported that she had received psychiatric medication management at a residential substance abuse treatment program from June 2008 through March 2009, and in the fall 2010. Piccini reported intermittent sleep difficulty and a fair appetite. She had longstanding difficulty in dealing with day-to-day stresses and was frequently irritable and angry. Piccini described that her alcohol abuse began when she was a teenager. She reported drinking hard liquor on a daily basis through September 2010. She had decreased her consumption over the past few months but continued to use alcohol to treat the symptoms of her stress. Piccini reported that she had not used cocaine on a regular basis since 2008.

Dr. Dubro described Piccini as cooperative during the examination. She was adequately groomed and there was no evidence of fidgety or hyperactive behavior. Her speech was fluent and clear, and her thought processes were coherent and goal directed. She presented with no delusions, hallucinations, or thought disorder. Her affect was full and her mood was euthymic. Dr. Dubro found Piccini's attention and concentration to be mildly impaired. Piccini was able to

---

[3] At the hearing, Piccini's counsel informed the ALJ that Piccini was no longer a patient of Dr. Angara. Due to issues with her insurance, Piccini was now seeing a new physician, but she had not yet had an examination. Piccini and her counsel stated that the new physician needed more time to assess Piccini's condition before an assessment could be provided.

perform simple mental addition and subtraction and could perform simple multiplication and division with repetition of the problem. Piccini was unable to perform two-step arithmetic calculations mentally, even with repetition. Piccini's recent and remote memory skills were mildly impaired. She recalled three out of three items within one minute and two out of three items after five minutes. She could repeat four digits forward and three backward. Dr. Dubro estimated Piccini's cognitive functioning to fall in the below average range, and she possessed a general fund of information that was appropriate for her experience. Piccini's insight was fair but her judgment was poor as a result of her problems with alcohol.

Piccini could dress herself and maintain her hygiene independently. She cleaned her home several times a week, did laundry, and shopped for food approximately once a week. She prepared meals for her children every day. She spent time with only her immediate family. Piccini reported that she used public transportation independently and could manage her own money.

Dr. Dubro diagnosed Piccini with mood disorder, NOS, alcohol abuse in partial remission, and cocaine abuse in sustained remission. Dr. Dubro concluded that Piccini could follow, understand, remember, and attend to directions and instructions. Her attention span and concentration were mildly impaired, and she would have mild difficulties in learning new tasks. Dr. Dubro assessed that Piccini could perform daily tasks and complex tasks independently and on a regular basis. She displayed moderate difficulties in her ability to interact with others, and due to her alcohol abuse, had displayed problems with adequate judgment. Dr. Dubro stated that Piccini would have mild difficulties in her ability to regularly follow a routine and maintain a schedule.

According to Dr. Dubro, Piccini's symptoms did not significantly interfere with her ability to function on a daily basis. Dr. Dubro recommended that Piccini be referred for outpatient substance abuse and mental health treatment. Piccini's prognosis was fair.

### 2.  Dr. T. Bruni, State Psychologist

On February 24, 2011, Dr. T. Bruni, a state agency psychologist, evaluated the evidence of record and completed a Psychiatric Review Technique form. Dr. Bruni determined that Piccini's impairments, affective disorder and substance addiction disorders, were not severe. Dr. Bruni concluded that the medical evidence did not establish a "Paragraph B" listing impairment. Piccini had no restrictions in activities of daily living and only mild restrictions in maintaining social functioning and concentration, persistence, or pace. Furthermore, Piccini had no episodes of deterioration of extended duration. Dr. Bruni also concluded that Piccini's impairments did not satisfy the "Paragraph C" criteria for disability.

Dr. Bruni noted that Piccini was not in any mental health or substance abuse treatment programs at the time of his review of the record. He also noted that though Piccini informed the consultative examiner that she had been hospitalized three times, none of them were of extended duration. Dr. Bruni concluded that the medical evidence of record indicated that Piccini had mild limitations in maintaining social functioning, attention, and concentration. The limitations, however, were not severe and did not significantly interfere with her ability to function on a daily basis.

## III.  The Administrative Hearing

### A.  Piccini's Testimony

Piccini appeared at the hearing on March 19, 2012, with counsel. Piccini testified that she resided in Poughkeepsie, New York, in an apartment with her two children, ages 7 and 3 at the

time of the hearing. Social Services paid for Piccini's rent and utilities. Piccini also received food stamps. Piccini previously applied for disability benefits in May 2009, and was denied but did not understand that she could appeal the decision.

The ALJ questioned Piccini about her drinking. She testified that she was clean and sober at the time of the hearing, but that she had briefly relapsed in November 2010 after she was raped by her uncle. Piccini testified that before the relapse, she had not consumed alcohol for approximately two to three months. While Piccini had previously voluntarily participated in a treatment program she was not currently in one. Piccini testified that she did not believe she needed the assistance of a program anymore and her therapist did not seem to be worried about her. Piccini's family would not drink around her, and she no longer would hang out with friends who were a bad influence on her. Piccini testified that she spent most of her time with her mom or her sister.

At the time of the hearing, Piccini was not working. She last tried to work as a temporary employee in June 2011. She worked in the stock room of Saks Off 5th, but quit after a week and a half. When she began working at 6:00 a.m., she was fine because there were no people around at that time. But then she would have panic attacks being in the mall. When the ALJ asked Piccini what would make her panic, she responded, "I can't really – I can't explain it, it just comes and goes, sometimes it gets worse or sometimes it gets a little calm . . . ." (R. 48.)

Piccini testified that she would take the bus to work, and her sister would care for her children while she was at work. Piccini's mother would occasionally come to help her. Piccini told the ALJ that she had dealt with child protective services when she tried to commit suicide in 2008 while her children were in the house.

The ALJ asked Piccini about her job in Virginia before her return to New York. Piccini was in charge of makings shipments of T-shirts. It was a very small factory with only approximately nine people in the whole warehouse. Everyone had their own space. During this job, Piccini experienced panic. She missed work days but was ashamed to tell people about her condition because she was worried they would look at her like she was crazy. The ALJ asked her to describe what keeps her from working. Piccini testified that it was her depression. She wants to be normal and work. She is tired of the panic attacks and believes that she will one day get better. She has been aware of the fact that something is wrong with her since she has refrained from alcohol and drugs.

Piccini told the ALJ that she cannot shop for food. She gets red and her heart starts racing. Her ears get hot and she needs air. When she gets to the store, she completely forgets why she went shopping. She feels like everybody is looking at her or following her. She just wants to hurry up and get out so she can get in her "comfort zone." (R. 53.) She never goes to the store alone. She constantly smokes cigarettes because of her nerves. She gets headaches because she is constantly thinking about random things and cannot focus on one thing.

Piccini testified that she is able to take care of her children at home. She feels safe in her house. She cooks every day. Her parents are the ones who usually take the kids outside. When she tries to take her children to the park, she can stay for only around five minutes because she cannot sit still. Piccini would usually take her seven-year-old child to school and would meet with the teachers.

The ALJ asked Piccini to describe the medications she was taking. Piccini testified that she was taking Zoloft for depression and Xanax for her panic attacks. The psychiatrist Piccini saw in Newburgh stopped taking her insurance and so she went for a period of months without

13

any medication. When she came to New York, her therapist told her to go to the emergency room because it would take a month to get an appointment with the psychiatrist to get her medication. It was a big risk to be off the medication for a couple of months. Piccini stated that she could feel the Zoloft starting to work. She was not sleeping as much as she was before, and the panic attacks were better, though they were not completely gone.

Piccini testified that she used to take Abilify, but the medication was switched because it did not work for her. Piccini stated that she sometimes stays in bed for three or four days. At other times she would stay in bed only one day out of the week. She would often try to have small projects at home to help her get out of bed. Now that her sister is gone, she has to get out of bed to care for her younger child.

The ALJ inquired about Piccini's education. She told him that she completed the ninth grade and was an average student, always on the borderline. She testified that she struggles to read and feels embarrassed to read a book to her son because he is a better reader. The ALJ asked Piccini about her math skills, specifically about whether she knew if she was given the right change after purchasing cigarettes. Piccini stated that she did not count the change; if something cost $9.53, she would give the cashier ten dollars plus an extra dollar for tax.

Piccini testified that she had wanted to be a paralegal and took a clerical program but did not pass the test, despite taking it twice. She also went to night school for a period of time to get her GED, but it was really hard for her. She also tried to take college courses, but did not qualify for financial aid because her scores were too low. She had recently finished a night class in December 2011. There was hardly anybody in the class and the teacher focused on Piccini one-on-one because she was behind. Piccini took the GED test but did not pass because she did not take the second part of the test.

Piccini testified that she did not have a computer but did own a television, which had been purchased for her by her parents. She did not watch television very often because she would lose interest. Piccini would attend medical appointment every week and had not missed any recent appointments. She would go to the appointment with her younger child.

The ALJ further inquired into Piccini's employment. Piccini testified that she worked in Manassas in the shipping department of an insurance company that belonged to her uncle. The position involved clerical work and included answering phones and processing payments. Her employer was aware of her situation and allowed her to go home early if she needed to. When she was younger she had several full-time jobs with 40-hour work weeks. She worked for Sprint in telemarketing and for her father overseeing a shipping department. Even though Piccini was using drugs and alcohol at that time, she was able to function well at work. Piccini testified that her memory was now a problem. In the orientation for her last job, she was always lost.

Piccini's attorney asked her to clarify the living arrangements with her sister. Piccini testified that up until two months before the hearing, Piccini's sister had lived with her since the birth of Piccini's first child. Her sister helped her with the children during this period. Now that her sister had moved out, her parents tried to help out but it was difficult because of the distance. Piccini considered moving to the city to be closer to them, but she could not afford to give up the financial assistance she was receiving. She testified that she calls her mother when she has really bad panic attacks, and her mother tries to calm her down. Sometimes her mother would come and spend three to four days to help Piccini. Piccini would constantly call the ambulance because she thought she was having a heart attack.

Piccini recounted that she was raised in a good home and does not know why she is the only one with these issues. She was sexually assaulted by her son's father and was a victim of

domestic violence. She was in a relationship with this man for 15 years. When she stopped

taking drugs, she began to feel like she could not control her mind.

### B.  Vocational Expert Testimony

Pat Green, a vocational expert, testified at the hearing. The vocational expert first

summarized Piccini's prior work experience. Piccini previously performed work that fell into

five different general work categories: (1) material handler, semi-skilled work at a heavy

exertional level; (2) telemarketer, semi-skilled work at a sedentary exertional level; (3)

administrative assistant, skilled work at a sedentary exertional level; (4) sales clerk, unskilled

work at a light exertional level; and (5) shipping and receiving supervisor, skilled work at a light

exertional level.

The ALJ then asked the vocational expert to assume that Piccini's residual functional

capacity had the following limitations: (1) no work around hazards such as moving machinery or

heights; (2) limited to unskilled, simple one- to two-step tasks; (3) low stress, meaning only

occasional decision-making or exercising of judgment, only occasional changes in work setting,

and no fast paced production; (4) no public interaction and only occasional interaction with

coworkers; and (5) limited to working with things rather than people. Given these limitations, the

vocational expert testified that Piccini could not perform any of her prior work.

The ALJ then asked the vocational expert to assume Piccini's age, education, experience,

and the described RFC and asked if there were any jobs that matched. The vocational expert

identified three jobs that would match these qualifications. Piccini could work as a hand

packager, which required unskilled medium exertional work. There were 3,500 of these jobs in

the region and 164,000 in the national economy. She could also perform the job of dishwasher,

an unskilled medium exertional position. There were 6,000 of these jobs in the region and

16

272,000 in the national economy. Finally, Piccini could work as a garment sorter, an unskilled job with light exertion. There were 3,800 of these jobs in the region and 125,000 jobs in the national economy. The ALJ asked the vocational expert if these jobs were exhaustive or representative, and the vocational expert testified that they were representative.

The ALJ asked the vocational expert to also consider whether any jobs would be available if Piccini needed additional time of task, specifically missing two days of work a month and being off task 15 percent of each work day. The vocational expert testified that such limitations would exclude the work previously identified. Furthermore, there would be no available jobs that could accommodate these restrictions.

On April 6, 2012, the ALJ issued his decision denying Piccini's claim for DBI, and on April 4, 2013, the Appeals Council denied Piccini's request for review, thereby rendering the decision of the Commissioner final.

## DISCUSSION

### I.    Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Dargahi v. Honda Lease Trust, 370 F. App'x 172, 174 (2d Cir. 2010) (citation omitted). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial

evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*" (citation and internal quotation marks omitted; emphasis in original)).

When, as here, the court is presented with an unopposed motion, it may not find for the moving party without reviewing the record and determining whether there is sufficient basis for granting the motion. See Wellington v. Astrue, 12 Civ. 03523 (KBF), 2013 WL 1944472, at *2 (S.D.N.Y. May 9, 2013) (recognizing, in an action appealing the denial of disability benefits, the court's obligation to review the record before granting an unopposed motion for judgment on the pleadings); Martell v. Astrue, 09 Civ. 01701 (NRB), 2010 WL 4159383, at *2 n.4 (S.D.N.Y. Oct. 20, 2010) (same); cf. Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004) ("[C]ourts, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." (citation and internal quotation marks omitted)).

18

*Pro se* litigants "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation marks omitted); see Alvarez v. Barnhart, 03 Civ. 8471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal *pro se* standard in reviewing denial of disability benefits).

## II.    Definition of Disability

A claimant is disabled under the Act if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be determined to be disabled only if the impairment(s) are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the Social Security Administration has established a five-step sequential evaluation process when making disability determinations. See 20 C.F.R. § 404.1520. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (citation omitted). A claimant bears the burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to prior work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given her RFC, age, education, and past relevant work experience. 20 C.F.R. § 404.1560(c)(2); Melville, 198 F.3d at 51.

"When there is medical evidence of an applicant's drug or alcohol abuse, the 'disability' inquiry does not end with the five-step analysis." Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 123 (2d Cir. 2012). In 1996, Congress enacted the Contract with America Advancement Act (the "CAAA"), which amended the Social Security Act so that "[a]n individual shall not be considered . . . disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 1382c(a)(3)(J). See also Cage, 692 F.3d at 123. Accordingly, if the ALJ determines that a claimant is disabled under the sequential analysis, the ALJ must then determine whether the SSA would still find the claimant disabled if she stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b)(1). See also 20 C.F.R. § 404.1535(a) ("*If we find that you are disabled* and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug

addiction or alcoholism is a contributing factor material to the determination of disability.")
(emphasis added).

The language of § 404.1535 makes it clear that the ALJ must *first* make a determination
as to disability by following the five-step sequential evaluation process, "without segregating out
any effects that might be due to substance use disorders." Brueggemann v. Barnhart, 348 F.3d
689, 694 (8th Cir. 2003). See id. at 693-94. ("The plain text of the relevant regulation requires
the ALJ first to determine whether [claimant] is disabled. . . . The ALJ must base this disability
determination on substantial evidence of [claimant's] medical limitations without deductions for
the assumed effects of substance use disorders."); Newsome v. Astrue, 817 F. Supp. 2d 111, 134
(E.D.N.Y. 2011) ("The ALJ's initial disability determination under the regulations 'concerns
strictly symptoms, not causes.'" (quoting Brueggemann, 348 F.3d at 694)). Once the claimant is
found to be disabled, the ALJ then considers whether the drug addiction or alcoholism is a
contributing factor by asking whether the claimant would still be considered disabled if he
stopped abusing drugs or alcohol. See Cordero v. Astrue, 574 F. Supp. 2d 373, 377 (S.D.N.Y.
2008). See also Corpus Juris Secundum, 81 C.J.S. Social Security and Public Welfare § 105 ("A
conclusion may be reached whether a claimant's substance use is a contributing factor material
to the determination of disability, so as to preclude benefits, only after an administrative law
judge has made an initial determination that the claimant is disabled, determined that drug or
alcohol use is a concern, and obtained substantial evidence showing what limitations would
remain in the absence of the claimant's alcoholism or drug addiction.").

If the claimant's remaining impairments are disabling, the claimant's drug or alcohol
abuse is not a contributing factor material to the disability determination, and the SSA will find
that the claimant is disabled. 20 C.F.R. § 404.1535(b)(2)(ii). See also Ward v. Comm'r of Soc.

Sec., 11 Civ. 6157 (PAE), 2014 WL 279509, at *14 (S.D.N.Y. Jan. 24, 2014). The Second

Circuit has joined a majority of other circuits in concluding that the claimant bears the burden of

proving that her drug or alcohol abuse is immaterial to the disability determination. Cage, 692

F.3d at 123.

### III.    The ALJ's Determination

On April 6, 2012, after evaluating Piccini's claims pursuant to the sequential evaluation

process, the ALJ issued a decision finding that Piccini was not disabled from June 29, 2010,

within the meaning of the Social Security Act. At step one, the ALJ determined that Piccini had

not been engaged in "substantial gainful activity" ("SGA"). At step two, the ALJ found that

Piccini had the following severe impairments: (1) bipolar disorder; (2) mood disorder; (3)

anxiety disorder with panic attacks; (4) depression; and (5) alcohol and cocaine abuse.

At step three, the ALJ found that Piccini's impairments, however, did not meet or

medically equal any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P,

Appendix 1. The ALJ concluded that Piccini's impairments did not satisfy the paragraph B

requirements under sections 12.04 (Affective Disorders) or 12.06 (Anxiety Related Disorders).

To satisfy the paragraph B criteria for both sections, Piccini's impairments had to result in two of

the following: (1) marked restriction of activities of daily living; (2) marked difficulties in

maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence,

or pace; or (4) repeated episodes of decompensation, each of extended duration.[4] 20 C.F.R. Pt.

404, Subpt. P, App'x 1 at §§ 12.04(B) and 12.06(B).

---

[4] "The term repeated episodes of decompensation, each of extended duration in the[] listings means three
episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." If the
claimant has experienced "more frequent episodes of shorter duration or less frequent episodes of longer
duration, [the Commissioner] must use judgment to determine if the duration and functional effects of the

The ALJ found that the restrictions or difficulties resulting from Piccini's impairments were only mild to moderate. As to the activities of daily living, the ALJ determined that Piccini's restrictions were only mild, based on an examination of the consultative report of Dr. Dubro and Piccini's testimony at the hearing. The ALJ noted that Piccini did not allege having any difficulties tending to her personal needs or performing daily living activities, including the care of her two children. Furthermore, Piccini told Dr. Dubro that she was able to do general cleaning several times a week, take care of the laundry, shop, prepare meals for her two children, use public transportation, and manage her own money.

With regard to social functioning, Piccini's difficulties were also only mild. In support of this determination, the ALJ noted a report from NYPH, dated March 2009, which included a diagnosis of depressive disorder, alcohol abuse, and cocaine abuse. The record indicated that Piccini had overdosed on her psychiatric medication and alcohol following an argument with her boyfriend. Piccini reported that she became emotional easily but had no history of psychosis. While Piccini had an active social life with friends and family, she had stopped communicating with her friends because they abused drugs.

As for Piccini's concentration, persistence, and pace, the ALJ concluded that Piccini's impairments were only moderate. Dr. Dubro's report indicated that Piccini had intermittent sleep difficulty and "longstanding difficulties in dealing with day to day stress . . . ." (R. 14.) Piccini reported to Dr. Dubro that she was frequently irritable and angry. The ALJ noted that Piccini did not show signs of fidgety or hyperactive behavior during her examination by Dr. Dubro. Her recent and remote memory skills, as well as her attention and concentration, were only mildly

episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 at § 12.00(C)(4).

impaired. Her insight was fair but her judgment was poor due to Piccini's alcohol problems. The ALJ noted Dr. Dubro's assessment that Piccini could follow, understand, and attend to directions and instructions, and had only mild difficulties in learning new tasks. She did, however, display moderate difficulties in her ability to interact with others. Dr. Dubro concluded that Piccini could independently perform daily tasks and complex tasks regularly.

Finally, in his paragraph B analysis, the ALJ noted that Piccini had experienced no episodes of decompensation of extended duration. Though the record showed that Piccini had a history of psychiatric treatment for depression, anxiety, and suicide attempts, Piccini had not maintained compliance with her formal mental health treatment. Furthermore, Piccini's condition had not required inpatient psychiatric hospitalization. The ALJ emphasized that the medical evidence did not demonstrate that Piccini's symptoms worsened or remained the same following a period of sobriety or compliance with medical treatment: "To the contrary, the record shows that when she was compliant with psychiatric medications, and abstinent, albeit for short periods of time, her symptoms improved." (R. 15.) The ALJ concluded that the record showed that Piccini did not have a sustained period of sobriety. Because Piccini's impairments did not result in more than two areas of marked restriction or one area of marked restriction and repeated episodes of decompensation, Piccini did not satisfy the criteria of 12.04(B) or 12.06(B).

The ALJ also considered whether Piccini satisfied the criteria of paragraph C for sections 12.04 and 12.06 and concluded that "the evidence fail[ed] to establish the presence of the 'paragraph C' criteria." (R. 15.) Because neither the paragraph B nor the paragraph C criteria of sections 12.04 or 12.06 were met, Piccini's impairments did not constitute a Listings level impairment.

24

The ALJ then proceeded to assess Piccini's residual functional capacity, concluding that she was able to perform a significant range of work at all exertional levels but had non-exertional limitations due to her mental impairments.[5] These non-exertional limitations restricted Piccini to "the performance of simple 1 to 2 step low stress jobs defined as performing duties involving occasional decision making, exercise of judgment in job performance and occasionally adapting to changes in the work setting with no fast production paced jobs." (R. 15.) Piccini could not interact with the public and was limited to occasional work-related interaction with her co-workers. She was also limited to jobs that dealt with things rather than people.

At step four, the ALJ found that Piccini was unable to perform any of her past relevant work. At step five, the ALJ determined that Piccini, given her age, education, work experience and RFC, had the capacity to perform other types of jobs that existed in significant numbers in the national economy, including hand packer, dish washer, and garment sorter.

## IV.   Legal Analysis

### A.  Alcohol Abuse

In connection with step three of the sequential evaluation process and in determining Piccini's RFC, the ALJ wove in evidence concerning the effects of Piccini's alcohol abuse. Although the ALJ's decision is otherwise thorough, this legal error prevents the Court from applying the substantial evidence standard to uphold a finding of no disability. Rather, because

---

[5] A non-exertional impairment is "[a]ny impairment which does not directly affect [the strength demands of work such as] the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments that affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, handle, and use of the fingers for fine activities." Archambault v. Astrue, 09 Civ. 06363 (RJS)(MHD), 2010 WL 5829378, at *35 (S.D.N.Y. Dec. 13, 2010), rep. and rec. adopted by 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011) (citation and quotation marks omitted; alteration in original).

of this legal error, it is unclear whether or not Piccini's alcoholism was the reason for the determination that she was not disabled.

The ALJ's opinion made reference to Piccini's alcohol consumption throughout his decision. For instance, at step three, the ALJ indicated that the record evidence does not show that Piccini's "mental symptoms had worsened or remained the same following a period of sobriety and or compliance with medical treatment. To the contrary, the record shows that when she was compliant with psychiatric medications, and abstinent, albeit for short periods of time, her symptoms improved, however, the record also shows the claimant has not had a sustained period of sobriety." (R. 15). He continued to reference her alcoholism in connection with her RFC assessment. The ALJ noted that the "record documents the claimant's history of alcohol and polysubstance abuse, including the claimant's own admission to a February 2011 consultative psychiatric interviewer that she was still drinking," and he referenced Piccini's sister's report that Piccini has been abusing alcohol for over 10 years. (R. 17.) The ALJ noted that there "is no indication in the record that the claimant has had a sustained period of sobriety." (R. 17.)

Relatedly, the ALJ relied extensively on the consultative examiner, who indicated that there was a relationship between Piccini's alcohol use and her symptoms. The ALJ stated that "[Piccini's] [j]udgment was noted to be poor [by Dr. Dubro] and this had been associated with the claimant's problems with alcohol." (R. 15.) He also emphasized that Dr. Dubro found Piccini's "mood disorder symptoms [to be] associated with her alcohol abuse problems. . . ." (R. 15). Such statements indicate that the ALJ may have improperly minimized or excluded symptoms because they may have been caused by substance abuse. Whether alcoholism or drug

26

addiction is a contributing factor to disability may be considered only *after* the initial disability determination is made. The ALJ never cited to 20 C.F.R. § 404.1535 in his decision.

The ALJ's references to Piccini's alcohol abuse, sprinkled throughout the decision, appear to conflate the substance abuse analysis with the disability determination itself. See Brueggemann, 348 F.3d at 694 ("The ALJ must base this disability determination on substantial evidence of [claimant's] medical limitations without deductions for the assumed effects of substance use disorders."). Accordingly, remand is necessary so that the ALJ can separately determine Piccini's disability before assessing whether or not her alcohol abuse constitutes a contributing factor material to that determination. See Newsome, 817 F. Supp. 2d at 134-35 (remanding in light of legal error where ALJ did not go through five step process before making a materiality determination); Webb v. Colvin, 12 Civ. 0753 (WMS), 2013 WL 5347563, at *5 (W.D.N.Y. Sept. 23, 2013) (remanding where "the lack of further specific discussion of these limitations renders it impossible to determine whether the ALJ's mental RFC determination was made after improperly discounting any non-exertional limitations stemming from Plaintiff's significant history of drug and alcohol abuse"); Day v. Astrue, 07 Civ. 0157 (RJD), 2008 WL 63285, at *6 (E.D.N.Y. Jan. 3, 2008) (remanding where "[i]t is unclear whether or not plaintiff's alcoholism and drug abuse were reasons for the determination that she was not disabled at step three of the ALJ's analysis"); Orr v. Barnhart, 375 F. Supp. 2d 193, 201 (W.D.N.Y. 2005) (remanding to require the ALJ "to consider the ill effects that plaintiff's alcoholism had on her impairments and limitations" when determining the issue of disability and "only after finding that plaintiff is disabled, determine which impairments would remain if plaintiff stopped using alcohol").

The Court is mindful that, when the proper legal analysis is followed, the ALJ may conclude that substantial evidence supports a finding of no disability. But to assume that conclusion "creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998). See Schuler v. Colvin, 13 Civ. 0144 (GLS), 2014 WL 2196029 (N.D.N.Y. May 22, 2014) (noting that the ALJ's language that "'[t]he evidence does not indicate disabling mental impairments, particularly if [the claimant] abstains from abusing substances and takes her medications as directed' . . . could suggest that the ALJ improperly segregated out the effects of [the claimant's] substance use disorders in the first instance…. [I]t is clear that the ALJ considered the ill effects of [the claimant's] substance use on her functional abilities when determining that [the claimant] was not disabled.").

### B.  Treating Physician

The ALJ committed an additional error when he afforded Piccini's treating physician's opinion little weight because the physician "disregarded the claimant's admittedly pervasive alcohol and polysubstance abuse history in arriving at his assessment," concluding that the opinion was "not a reliable assessment regarding the claimant's mental residual functional capacity." (R. 19.) Dismissal of a physician's opinion during the initial determination of disability because he or she did not factor in substance abuse is improper under the regulations. See Brueggemann, 348 F.3d at 694 ("Substance use disorders are simply not among the evidentiary factors . . . the regulations identify as probative when an ALJ evaluates a physician's expert opinion in the initial determination of the claimant's disability." (citing 20 C.F.R. § 404.1527)). See also Vernon v. Astrue, 06 Civ. 13132 (RMB)(DF), 2008 WL 5170392, at *20 (S.D.N.Y. Dec. 9, 2008) ("While drug and alcohol use is relevant in determining whether a

claimant is disabled under the regulations, <u>see</u> 20 C.F.R. § 416.935, it bears no relevance to the weight that must be given to the opinion of a treating physician. <u>See</u> 20 C.F.R. § 416.927(d)(2).")

Accordingly, on remand, the ALJ must either afford Piccini's treating physician substantial weight, or provide legitimate reasons not to.

## CONCLUSION

Based on the evidence in the administrative record, the ALJ erred in failing to evaluate Piccini's disability in accordance with 20 C.F.R. § 404.1535.  Accordingly, I recommend that the Commissioner's motion for judgment on the pleadings be DENIED in its entirety and that the case be remanded.

*          *          *

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. <u>See also</u> Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Alison J. Nathan at the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Nathan. The failure to file these timely objections will result in a waiver of

those objections for purposes of appeal. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b),

72(b); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge


DATED:      New York, New York
            June 27, 2014










cc:         Angelina F. Piccini (*By Chambers*)
            6 Balding Avenue
            Apt #2
            Poughkeepsie, NY 12601